UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Case No.

SUSAN J. MOSELEY
    Plaintiff

V.

UNUM LIFE INSURANCE COMPANY OF AMERICA and UNUM GROUP,
    Defendants

**COMPLAINT**

This is a claim under the Employee Retirement Income Security Act of 1974 ("ERISA") to recover welfare-benefits after the defendants, Unum Life Insurance Company of America and its parent holding company, the Unum Group ("Unum Group" meaning the holding company and insurance subsidiary) unlawfully refused to continue to pay long-term-disability benefits to the plaintiff Susan Moseley ("Ms. Moseley") after 24 months. Unum Group refuses to acknowledge that Ms. Moseley is disabled due to symptoms of tick-borne illness. Unum Group insisted that Ms. Moseley was disabled due to non-physical reasons and limited her benefits to 24 months. In addition to recovery of long-term disability benefits, plaintiff seeks to recover interest, costs and attorneys' fees under 29 U.S.C. § 1132(g) (1).

## PARTIES

1. Plaintiff is Susan J. Moseley ("Ms. Moseley"), an individual having a usual place of residence in New London, Merrimack County, New Hampshire.

2. Defendant Unum Life Insurance Company of America is an insurance company formed under the laws of the state of Maine, having a substantial place of business at 1 Mercantile Square, Worcester, Worcester County, Massachusetts.

3. Defendant Unum Group is a corporation existing under the laws of the State of Delaware, having a principal place of business at One Fountain Square, Hamilton County, Tennessee, and having a place of business at 1 Mercantile Street, Worcester, Worcester County, Massachusetts.

## JURISDICTION AND VENUE

4. ERISA provides for concurrent jurisdiction over benefit claims in both the United States District Courts and state courts under Section 502(e)(1).

5. The ERISA statute, at 29 U.S.C. § 1133, as well as the Secretary of Labor regulations, at 29 C.F.R. § 2560.503-1 provide a mechanism for administrative or internal appeal of benefits denials. In this case, those avenues of appeal have been exhausted and this matter is now properly before this court for judicial review.

6. Venue is proper before this Court, because defendants are engaged in the business of insurance in this Commonwealth and have a place of business in Worcester County.

## FACTUAL ALLEGATIONS

A. *Information about Unum Group and its Parsimonious Claim Denials.*

7. Unum Group is a corporation that controls the activities of its subsidiaries including Unum Life Insurance Company of America under a General Services Agreement and other documents governing the operation of Unum Life Insurance Company of America.

8. All persons that conduct the business of Unum Life Insurance Company of America. are employed by the Unum Group. The details of this relationship are set-forth in the affidavit of William T. Bradley of the Unum Group. EXHIBIT A.

9. The Unum Group has a history of parsimonious claim denials specifically set forth in the Findings of and Facts and Conclusions of Law of United States District Judge James C. Mahan dated November 14, 2008, *Merrick v. Paul Revere*, 594 F.Supp.2d 1168 (D. Nev. 2008).

10. Similar conclusions are set forth in a law review article by the leading ERISA scholar, John H. Langbein, Sterling Professor of Law, Yale University, *Trust Law as Regulatory Law: The Unum/Provident Scandal and Judicial Review of Benefit Denials under ERISA*, 101 Northwestern Univ. Law Review 1315 (2007).

11. The United States District Court for the District of Massachusetts recently held in an ERISA long-term disability case "that Unum acted in bad faith, and not as a true fiduciary" concluding "Unum is demonstrably unable to exercise its discretion honestly and fairly." *Host v. First Unum Life Ins. Co.*, 569 F. Supp.3d 48, 59-60 (D. Mass. 2021).

12. In 2004, insurance regulators in Massachusetts and eventually all other states examined Unum Group. Insurance regulators and Unum agreed to a Plan of Corrective Action leading to a regulatory settlement agreement ("RSA").

13. On November 18, 2004, Unum Group signed the "RSA" with 47 state regulators, including the Commissioner of Insurance for the Commonwealth of Massachusetts.

14. Unum Group entered into a separate agreement with the Commissioner of Insurance for the State of California and a few other states. Unum Group paid $15 million in fines, and its insurance subsidiaries agreed to implement a corrective plan of action in the RSA, which resulted in payments approaching $700 million dollars to claimants whose benefits had been wrongfully denied or terminated.

15. "The RSA required Unum to reassess approximately 200,000 long-term disability claims that had previously been denied, as well as to restructure its claim handling procedures to ensure objectivity and fairness." *McManus v. D.C.*, 530 F. Supp. 2d 46, 58 (D.D.C. 2007).

16. On October 3, 2005, Unum Group and the regulators amended the RSA, where Unum Group agreed that it would be:

    *Giving significant weight to an attending physician's ("AP") opinion, if the AP is properly licensed and the claimed medical condition falls within the AP's customary area of practice, unless the AP's opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record. In order for an AP's opinion to be rejected, the claim file must include specific reasons why the opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record.* EXHIBIT B.

17. Unum may only reject the "AP's opinion" when "the claim file…include[s] specific reasons why the opinion is not well supported by medically acceptable clinical or diagnostic standards **and** is inconsistent with other substantial evidence in the record."

*Dwyer v. Unum Life Ins. Co. of Am.*, 548 F. Supp.3d 468, 473 (E.D. Pa. 2021) (emphasis added).

18. Unum incorporated the agreement that it would defer to the attending physician in its claim' manual, a portion of which is attached as EXHIBIT H.

19. Following the RSA, Unum never altered its ways in the long-term, only for a few years while regulators continued to supervise the Unum Group. *See* Phillip W. Thomas, *Fifteen Years Later - Did The Unum Group Improve Its ERISA Claims Handling Practices?* 39 Mississippi College Law Review, 199 (2021), and attached as EXHIBIT C.

20. The author concluded after surveying many court decisions: Contrary to ERISA's intent, Unum abrogates its fiduciary responsibility and administers claims as an adversary. Unum did not improve its claims handling practices after the 2004 RSA. Unum's criticized practices continued unabated to the present time. *Id.* at 236.

21. Unum Group tracks financial data pertaining to claims, and review specific claims reserves attributable to a particular insured through databases that can be viewed through other databases, sometimes called "Operations Metrics and Reporting."

22. E-mails are routinely sent by management to the claims handlers that discuss monthly, quarterly, and yearly historic targets and goals often called "recoveries."

23. Financial information is tracked and shared with claims handlers in various software-based document and orally by management to create "recoveries."

24. Unum Group uses the euphemism, including "recoveries" or "closures" to mean terminating claims.

25. In 2005, Unum Group established the "Manager Toolkit 2005 Business Plan & BBS

Communications The Business Center" which was the foundation for the Benefits Center Scorecards setting standards for liability acceptance rates and other metrics that affected company profitability.

26. The "Manager Toolkit" directs managers to cascade information to employees, so they align their interests with the financial goals of Unum Group.

27. As the "Manager Toolkit" clarifies, the more an individual or unit is perceived as contributing to the meeting of Unum Group's financial goals, the greater their share of the bonus pool.

28. Unum Group sets goals for claim terminations, liability acceptance rates and reopen rate goals, among other measures, and ties meeting such goals to the awarding of performance compensation. This is disclosed by the "Manager Toolkit 2005 Business Plan & BBS Communications The Business Center" when read with the Scorecard reports.

29. Unum Group management sends to its Claim Directors, or provides to the Claims Directors, Weekly Tracking – Quarter Review reports focusing on the number of claims that management expects will turn into "recoveries" at specified time periods.

30. Internal documents reveal that financial targets and goals for claim closures are set at the unit level and that there are goals set for open claim recoveries (i.e., denying an open claim) per day.

31. To receive bonuses, Unum employees are evaluated against certain criteria, which include planned claim terminations, expected liability acceptance rates, and anticipated reopen rates.

32. The monthly targets, or "recovery plans," include the count of total claims that should

be recovered.

33. Unum Group management sends to its Claims Directors, or provides to the Claims Directors, IDI Director Scorecard reports focusing on the number of claims it expects will turn into "recoveries" at specified time periods, and whether projections have been met. EXHIBIT D (filed in *Kelpe v. Unum Group* et al, 18-cv-326094, Superior Court, County of Santa Clara).

34. IDI Scorecards are color-coded, with green showing that an expectation is being met, and yellow or red showing that an expectation is not met.

35. Other documents reflect that targets and goals for claim closures are set down to the unit level, and there are goals set for open claim recoveries, i.e., ongoing claims, per day, and "momentum" focusing on the anticipated recoveries in a month. EXHIBIT E (filed in *Kelpe v. Unum Group* et al, 18-cv-326094, Superior Court, County of Santa Clara).

36. Unum Group utilizes a "balanced business scorecard" approach—at least down to the director level – to keep claims personnel informed throughout the year on whether the company is meeting the financial goals it sets for itself to trigger incentive compensation.

37. These scorecards are evidence of the continuation of Unum Group's claims practices which it promised to stop when it executed the RSA.

38. Unum Group Vice Presidents provide expected recovery expectations to Assistant Vice Presidents who share the information with Directors.

39. Together Vice Presidents, Assistant Vice Presidents and Directors have recovery goals each month and share information back and forth with each other each month.

40. Assistant Vice President, Marianne Justin, who was the Unum AVP over the Director confirmed that she received "financial guidance" each month. EXHIBIT F (selected excerpts from the Deposition of Marianne Justin, p. 47:23-51:6).

41. Ms. Justin also received a Weekly Tracking Report each Monday that contained new financial target numbers for her team. *Id.* at, 103:11-18. Ms. Justin explained that she shares the Weekly Tracking Reports with her team in weekly meetings on each Tuesday. *Id.* at, 80:13-82-21; 99:15-100:22. EXHIBIT G (filed in *Kelpe v. Unum Group* et al, 18-cv-326094, Superior Court, County of Santa Clara).

42. Directors in AVP Justin's team are expected to be familiar with how the Weekly Tracking Reports are formatted, how they work, and what their data means for their team. *Id.* at, 103:11-105:9.

43. AVP Justin confirmed that whether Unum's AVPs meet the financial metrics is part of their performance evaluation. *Id.* at, 136:9-16.

44. Ms. Justin provided additional testimony and referred to additional documents that are relevant to Unum's conflict of interest, but that testimony and evidence is currently designated "confidential."

45. Relative hereto, defendants have been operating under an inherent structural conflict of interest, because the benefits for which they are liable to pay Ms. Moseley from their own assets rather than a trust.

46. Focusing on financial goals rather than the merits of each claim violates ERISA.

### B. *The Long-Term-Disability Benefit Plan.*

47. Unum Group issued the group policy number 27903 011 ("Plan") to the National Apartment Association ("NAA"), to benefit the employees of NAA, agreeing to pay to Ms. Moseley, as an NAA employee and participant of the Plan, long-term-disability benefits ("LTD benefits") if she became disabled under the terms of Plan.

48. The Plan pays a percentage of the employee's monthly earnings, to a maximum benefit of $15,000 per month.

49. The LTD benefits are payable if the participant qualifies through age 65.

### C. *Vocational Information.*

50. NAA had employed Ms. Moseley as a vice president of business development.

51. In May 2018, Ms. Moseley became totally disabled under the terms of the Plan.

52. In May 2018, Ms. Moseley left work and never returned due to impairing illnesses caused by a tick bite.

### D. *Medical information supporting Plaintiff's total disability.*

53. In May 2018, Ms. Moseley was forced to stop working due to the disabling effects of Lyme disease.

54. Ms. Moseley's medical conditions are permanent disabling conditions, which, according to her treating physicians, will never improve, and permit her to return to work again.

55. Ms. Moseley's physicians have determined that he has remained totally disabled from performing the important duties of his own occupation since she was forced to stop working in May 2018, and that she continued to be totally disabled under the Plan terms through her 65th birthday.

### E.  The definition of "Disability" under the Plan.

56. According to the terms of the Plan:

    *You are disabled when Unum determines that:*
    *-   You are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and*
    *-   You have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.*

    *After 24 months of payments, you are disabled when Unum determines that due the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.*

57. According to the terms of the Plan:

    *Disabilities due to sickness or injury, which are primarily based on self-reported symptoms, and disabilities due to mental illness have a limited pay period of up to 24 months.*

### F. The Claim History.

58. On May 9, 2018, Ms. Moseley applied for short-term disability benefits under a plan provided by NAA, and under two individual disability insurance policies issued by National Life of Vermont and administered by the Unum Group.

59. After initially denying Ms. Moseley's benefit claims under the short-term plan, the individual disability insurance policies, and the Plan, Unum Group paid monthly benefits to Ms. Moseley.

60. To date, Unum Group pays monthly benefits under the lifetime coverage provided by a disability insurance policy issued by National Life of Vermont and administered by the Unum Group.

61. Unum Group paid LTD benefits for 24 months through September 1, 2020, and only ceased paying benefits not because Ms. Moseley was no longer totally disabled, but

10

because Unum Group asserted, she was disabled due to a mental illness and not the symptoms of Lyme disease.

62. Ms. Moseley had first been diagnosed with Lyme disease as early as 2014.

63. Lyme disease is a clinical diagnosis and there is no definitive laboratory test for Lyme disease.

64. Ms. Moseley treats with a national known Lyme disease treating physician.

65. Unum Group relied on an employee, Scott B. Norris, who has not practiced clinical medicine since for at least 10 years, Dr. Norris and is a prolific denier that Unum insureds are not disabled as illustrated by the following cases:

A. *Boykin v. Unum Life Ins. Co. of Am.*, 2022 U.S. Dist. LEXIS 27455
   1. California Eastern District Court February 15, 2022
      a. Shephardized: No Appellate activity; No Negative activity
         b. Court criticizes Dr. Norris.

B. *Boersma v. Unum Life Ins. Co. of Am.*, 2021 U.S. Dist. LEXIS 120966
   1. Tennessee Middle District Court June 29, 2021
         a. Shephardized: No Appellate activity; No negative activity
         b. Court discounts Norris's opinions of fibro, neuropathy

C. *Rios v. Unum Life Ins. Co.*, 2020 U.S. Dist. LEXIS 233953
   1. California Central District Court December 10, 2020
         a. Shephardized:
                  1. Rios v. Unum Life Ins. Co. of Am. 2021 U.S. App. LEXIS 38138, 2021 WL 6116635 9th Circuit
                     a. It never addressed her request for "any occupation" benefits. Applying de novo review, the district court concluded that Rios was entitled to both "own occupation" and "any occupation" benefits. We affirm in part, reverse in part, and remand for further proceedings.

11

D. *Clark v. Unum Life Ins. Co. of Am.*, 2018 U.S. Dist. LEXIS 175341
   1. Tennessee Middle District Court October 10, 2018
      a. Shephardized: No Appellate activity; No negative activity
      b. Court discounts Norris's opinions as "selective review", simply reiterating the negative points of records instead of providing evidence to support his conclusions
         1. Fibro, degenerative disk disease, chronic pain

E. *Tam v. First Unum Life Ins. Co.*, 491 F. Supp. 3d 698
   1. California Central District Court September 30, 2020
      a. Shephardized: No Appellate activity; No negative activity
      b. "[a]llowing [Unum] to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004).
      c. CFS, cognitive dysfunction, chronic enterovirus infection, diffuse paresthesia, anxiety
      d. This case is more of a rebuke of Unum, but Norris is mentioned.

F. *Christoff v. Unum Life Ins. Co. of Am.*, 2019 U.S. Dist. LEXIS 167889
   1. Minnesota District Court September 30, 2019
      a. Shephardized: No Appellate activity; No negative activity
      b. Court discounts Norris's review after most treating physicians certify disability "In his report, Dr. Norris reaches conclusions contradicting those of several of the medical professionals who had previously examined and treated Christoff, stating that Christoff suffered no "pain-limited weakness" or reduced range of motion, and expressing doubts about Christoff's lack of medication, ignoring the rationale provided throughout his records by his treating physicians."
         1. "While the Court is not persuaded that Unum's evaluators were unqualified *per se*, the opinions of Christoff's own doctors were far better supported. Moreover, Unum's interpretation of the medical records fabricated conflict and inconsistency where none existed- Christoff's submissions have been thorough and consistent, and Unum's evaluators did not directly contradict the evidence presented in support of Christoff's claim. Rather, they largely agreed until the very latest reviews, during which Unum's inhouse doctor ignored information unfavorable to the termination decision"
      c. Severe fibromyalgia

G. *Dewsnup v. Unum Life Ins. Co. of Am.*, 2018 U.S. Dist. LEXIS 208688
   1. Utah District Court December 10, 2018
      a. Shephardized: No Appellate activity; No negative activity

    b. Court accused Unum's reviewers of "cherry-pick[ing]" the information helpful to its decision. I highlighted the relevant parts. Dr. Norris was one of four reviewing physicians.
    c. Heart attack

 H. *Fleming v. Unum Life Ins. Co. of Am.*, 2018 WL 6133859
   1. California Central District Court November 20, 2018
    a. Shephardized: No Appellate activity; No negative activity
    b. Court criticized Unum for assigning a reviewing physician that does not have appropriate experience/training in the field of medicine to make an appropriate medical judgement.
    c. Neck, thoracic spine injuries following car accident

66. Ms. Moseley appealed Unum Group's adverse-benefit determination.

67. Ms. Moseley has exhausted all mandatory presuit appeals.

## SOCIAL SECURITY ADMINISTRATION AWARDS BENEFITS

68. Under the RSA Unum Group agreed it restructure its claims handling process and agreed to:

*give significant weight to evidence of an award of Social Security disability benefits as supporting a finding of disability, unless the Companies have compelling evidence that the decision of the Social Security Administration was (i) founded on an error of law or an abuse of discretion, (ii) inconsistent with the applicable medical evidence, or (iii) inconsistent with the definition of disability contained in the applicable insurance policy.*

69. Under most long-term disability policies, including the one under which Ms. Moseley filed her claim for benefits, after the expiration of the "own occupation" period which

13

covers the first 24-months, Ms. Moseley needs to show that she is incapable of performing "any occupation" to continue to receive benefits.

70. The "any occupation" standard is based on the training, education, and experience, and Ms. Moseley's restrictions and limitations for determining whether she can work in an occupation that could pay her sixty percent or more of her predisability earnings.

71. The Social Security Administration definition of disability is harder to meet, compared with Unum Group's "any occupation" definition, because it examines whether an applicant is capable of performing "substantial gainful activity" which has a much lower earnings threshold when compared with the 60% predisability earnings standard in the Unum Group policy. *See U.S. ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 303-304 (1st Cir. 2010) (discussing the difference between Unum Group's "any occupation" qualification and the Social Security Administration's standard for qualifying for benefits).

72. In conformity with the terms of the Plan, Ms. Moseley applied for benefits under the United States Social Security Administration ("SSA") disability insurance program ("SSDI").

73. On October 22, 2019. SSA approved Ms. Mosley's claim for SSDI and determined she was totally disabled from gainful employment.

74. The SSA determined that Lyme disease was the impairing medical cause of Ms. Moseley's disability.

75. Ms. Moseley gave to Unum access to the SSA file.

76. Unum Group breached the terms of the RSA by failing to follow its agreement with the Massachusetts Commissioner of Insurance by deferring to the determination of the Social Security Administration.

## FIRST CAUSE OF ACTION
## BENEFITS DUE FROM DEFENDANTS
## UNDER ERISA 29 U.S.C. § 1132(a) (1) (B)

77. Ms. Moseley realleges the paragraphs set-forth above and incorporates the same by reference as if fully set forth herein again.

78. This Court must conduct a plenary proceeding in evaluating defendants' decision to refused to pay LTD benefits.

79. The final adverse-benefit determination was not supported by substantial evidence, was not reasonable, was legally wrongful, and was not in compliance with applicable laws.

80. As a result of defendants' refusal and failure to pay to Ms. Moseley benefits provided to her, Ms. Moseley is entitled to recover welfare-benefits due to her under the terms of the Plan pursuant to 29 U.S.C. § 1132 (a)(1)(B).

## SECOND CAUSE OF ACTION
## AWARD OF ATTORNEYS' FEES AND COSTS

81. Ms. Moseley realleges the paragraphs set-forth above and incorporates the same by reference as if fully set forth herein again.

82. As a result of defendants' acts and omission, Ms. Moseley is entitled to recover under 29 U.S.C. § 1132 (g)(1), costs of this litigation, including reasonable attorneys' fees and interest as allowed by law.

WHEREFORE, plaintiff demands judgment for relief against Unum Group and Unum Life Insurance Company of American as follows:

A.   For a sum of money to be determined by this Court, plus pre-judgment interest (at no less than the New Hampshire statutory rate), post-judgment interest, costs, and reasonable attorney's fees allowed by statute or otherwise.

B.   Injunctive relief declaring the rights and duties of the plaintiff and defendants regarding past benefits owed to the plaintiff, and future benefits to be paid to the plaintiff.

C.  For an order precluding defendants from using offsets in the LTD Plan because of its unclean hands.

D.  For an equitable order enjoining defendant from using unlicensed Massachusetts physicians from offering disability opinions regarding citizens of the Commonwealth of Massachusetts.

E. In the alternative, remanding the adverse-benefit determination to defendant to be decided again with an order requiring "full and fair review" under ERISA, 29 U.S.C. §1133(2).

F. For such other legal or equitable relief as this Court deems just and proper to make plaintiff whole for the losses suffered.

> Respectfully submitted
>
> SUSAN J. MOSELEY,
>
>
> /s/Jonathan M. Feigenbaum
> _____
> Jonathan M. Feigenbaum, Esq.
> B.B.O. No.546686
> 184 High Street
> Suite 503
> Boston, MA 02110
> Tel. No. : (617) 357-9700
> FAX No.: (617) 227-2843
> jonathan@erisaattorneys.com