UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SUSAN J. MOSELEY,<br>    Plaintiff,<br><br>v.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA and UNUM GROUP,<br>    Defendants | CIVIL ACTION NO.<br>4:22-CV-40079-RGS |

### DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### I.    NATURE AND STATUS OF PROCEEDINGS

This is an action by Susan J. Moseley to obtain additional disability benefits under an employee welfare benefit plan (the "Plan") provided by her employer, and governed by ERISA. The Plan was funded by a group policy issued to Ms. Moseley's employer by Unum Life Insurance Company of America ("Unum Life"). Ms. Moseley received benefits under the Plan from August 2018 through August 2020, totaling $139,516.90. By that time, Ms. Moseley had received benefits for the maximum period for a disability due to mental illness, 24 months. Ms. Moseley's inability to work arises from anxiety and depression. Ms. Moseley contends she is entitled to additional disability benefits based upon a physical condition, Lyme disease. Unum Life found Ms. Moseley is not disabled from her occupation in business development, sales and marketing due to a physical condition and denied further benefits.

Thus, the issue to be decided by this Court is whether Ms. Moseley has met her burden to prove Unum Life's decision that her disability, as of August 2020, is based on anxiety and depression was arbitrary and capricious.

## II.  STATEMENT OF FACTS

### A.  Key Policy Provisions

The Plan pays disability benefits when Ms. Moseley is unable to perform the material and substantial duties of her regular occupation for 24 months.  After 24 months, Ms. Moseley must be unable to perform the duties of any gainful occupation.  The Plan is funded by a policy issued by Unum Life (the "Policy").  With regard to disability, the Policy provides as follows:

> **HOW DOES UNUM DEFINE DISABILITY?**
>
> You are disabled when Unum determines that:
>
> - you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
> - you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.
>
> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably suited by education, training or experience.  (Administrative Record, Volume I, page UA-POL-LTD-30).[1]

The Policy defines regular occupation as:

> **REGULAR OCCUPATION** means the occupation you are routinely performing when your disability began.  Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.  (I, p. 42).

In the case of disabilities due to mental illness the Policy provides as follows:

> **WHAT DISABILITIES HAVE A LIMITED PAY PERIOD UNDER YOUR PLAN?**
>
> Disabilities, due to sickness or injury, which are primarily based on **self-reported symptoms**, and disabilities due to **mental illness** have a limited pay period up to 24 months.
>
> Unum will continue to send you payments beyond the 24 month period if you meet one or both of these conditions.

---

[1]  Hereinafter, references to the Administrative Record are designated by the Volume number followed by the applicable page number(s).

    1.      If you are confined to a **hospital or institution** at the end of the 24 month period, Unum will continue to send you payments during your confinement.

If you are still disabled when you are discharged, Unum will send you payments for a recovery period of up to 90 days.

If you become reconfined at any time during the recovery period and remain confined for a least 14 days in a row, Unum will send payments during that additional confinement and for one additional recovery period up to 90 more days.

    2.      In addition to item 1, if, after the 24 month period for which you have received payments, you continue to be disabled and subsequently become confirmed to a hospital or institution for at least 14 days in a row, Unum will send payments during the length of the reconfinement.

Unum will not pay beyond the limited pay period as indicated above, or the maximum period of payment, whichever occurs first.

Unum will not apply the mental illness limitation to dementia if it is a result of:

- stroke;
- trauma
- viral infection;
- Alzheimer's disease; or
- other conditions not listed which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment.  (I, p. 30.)

The Policy defines mental illness as:

**MENTAL ILLNESS** means a psychiatric or psychological condition regardless of cause such as schizophrenia, depression, manic depressive or bipolar illness, anxiety, personality disorders and/or adjustment disorders or other conditions. These conditions are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment.  (I, p. 40).

### B.    <u>Ms. Moseley's Occupation</u>

At the time Ms. Moseley applied for disability benefits in May 2018 she was employed by the National Apartment Association as a vice president of business development.  (II, pp. 154-155, 390-394).  Ms. Moseley had been employed by the National Apartment Association since January 2015. (V, p. 1761).  Prior to being employed at the National Apartment Association, Ms. Moseley had a variety of other positions that she had left because they were eliminated.

From 1992 to 1999, she was a vice president in the credit card division of Mellon Bank. That position was eliminated in 1999. (V, p. 1762).

She then worked for the American Medical Association from July 1999 to July 2009, until her position there was also eliminated. She then worked for the National Federation of Independent Businesses from November 2009 to December 2013 until that position was also eliminated. (V, p. 761).

In order to determine what Ms. Moseley's occupation was as it is performed in the national economy, Unum Life had a vocational review performed. The vocational review determined that her occupation in the national economy is a combination of Vice President of Business Development and a Vice President of Sales and Marketing. (VIII, pp. 3972-3975).

C.   **Ms. Moseley's Claim**

Ms. Moseley's last day of work was May 2, 2018. She applied for disability benefits the next day and immediately retained an attorney to assist her. (II, pp. 120-121, 157-158).

Unum Life undertook a review of Ms. Moseley's claim and approved long-term disability benefits by letter dated April 11, 2019. Unum Life found that Ms. Moseley qualified for benefits based upon her mental health conditions of depression and anxiety; that she became disabled as of May 3, 2018; and that benefits would begin as of August 2018 (after the applicable elimination period). (V, pp. 1723-1732).

Ms. Moseley received the full 24 months of benefits for her mental illness and those benefits ended in August 2020. Ms. Moseley was notified, and also offered the opportunity for an administrative appeal pursuant to the provisions of ERISA. (IX, pp. 3710-3715).

Ms. Moseley did pursue an administrative appeal. (IX, pp. 3762-3763). Unum Life conducted another review and issued its decision on June 1, 2022, upholding the prior

determination that Ms. Moseley's disability was caused by her mental health conditions and thus was subject to the 24 month limitation of benefits. (X, pp. 4033-4044).  A copy of Unum Life's final determination is attached hereto as **Exhibit A**.

### D. Ms. Moseley's Mental Health Conditions

In early 2015, right after starting her job at the National Apartment Association, Ms. Moseley began complaining about various physical symptoms, including dizziness, some balance problems, tingling in her arms and fingers, and cognitive decline.  A battery of tests and consultations in that timeframe found no physical condition that explained Ms. Moseley's symptoms.  That included MRIs, MRAs, lumbar puncture, lab tests, and consultations for infectious disease (including Lyme disease) and multiple sclerosis (III, pp. 907-936).

With regards to her cognitive issues, Ms. Moseley's primary care physician sent her for a neuropsychological evaluation in June 2015 (III, pp. 637-645).  That report contains a brief summary of the testing and consultations that Ms. Moseley had received up to that date. (III, p. 637).  Regarding Ms. Moseley's psychiatric condition, the report stated as follows:

> Specifically, her responses indicated that she is preoccupied with her health status, that her social interactions often focus on her health problems, and that her self-image is largely influenced by her belief that she is handicapped by poor health.  These findings are consistent with her report during the current clinical interview when she described stress associated with her health problems.  She also reported that her health problems (dizziness in particular) have had a negative impact on her mood by making it difficult for her to do things she enjoys and have increased her anxiety.  **It is clear that Ms. Moseley is experiencing a high degree of concern regarding her physical functioning.  Such persons tend to experience heightened cognitive difficulties and emotional distress at times of increase physical dysfunction.  Conversely, increased emotional distress likely results in increased cognitive difficulties and physical discomfort.  As such, her psychiatric functioning is clearly playing a role in the current clinical picture.** (II, p. 642).

The neuropsychological evaluation provided a number of recommendations including the following:

> Ms. Moseley reported stress, anxiety, and increased emotionality associated with her cognitive and physical symptoms and the effect they have had on her functioning.  **Thus, consultation and follow-up care with a psychiatrist are <u>strongly</u> recommended.  In addition to potential pharmacotherapy, she is strongly encouraged to participate in adjunctive psychotherapy.**  Ms. Moseley may benefit from therapy with a psychologist employing cognitive-behavioral techniques of cognitive restructuring, behavioral activation, and stress management.  **Improved mood/reduced stress will improve Ms. Moseley's quality of life and will likely have a positive impact on her perceived (and actual) cognitive functioning.** (II, p. 643).

Despite the recommendation, Ms. Moseley did not seek mental health treatment until September 2016 when she began seeing a psychotherapist, Vicki Anderson, Psy.D.  Ms. Moseley first saw Dr. Anderson from September 2016 to April 2018. During that time, in addition to psychotherapy, Ms. Moseley was prescribed Wellbutrin for her depression and Lorazepam for her anxiety. ((IV, pp. 1049-1087).  From the outset and consistently thereafter Dr. Anderson found Ms. Moseley to be experiencing significant depression and anxiety.  Dr. Anderson, not a physician, attributed Ms. Moseley's depression to Lyme disease. (IV, p. 1049).

Ms. Moseley saw Dr. Anderson for treatment about twice per month from September 2016 to October 2017. Visits thereafter were sporadic.  She last saw Dr. Anderson in April 2018. At that appointment, Ms. Moseley told Dr. Anderson she was leaving her job.  Dr. Anderson noted that going forward she would see Ms. Moseley, as needed. (III, pp. 818-819).

In October 2018, in connection with her application for Social Security disability benefits, Ms. Moseley's records were reviewed by a psychologist on behalf of Social Security, Lisa Fitzpatrick, Psy.D.  Dr. Fitzpatrick found Ms. Moseley suffering from severe depressive and anxiety disorders.  Dr. Fitzpatrick noted Ms. Moseley had a history of some treatment for her anxiety and depression, but accurately noted that it appeared Ms. Moseley had discontinued her treatment.  She also found that the anxiety and depression could be expected to produce fatigue;

understanding, memory and concentration limitations; and the inability to adapt to limitations. Dr. Fitzpatrick found Ms. Moseley's conditions to be moderately limiting. (VI, pp. 2105-2111).

Unum Life had its medical consultants review Ms. Moseley's claim in early 2019. Two psychologists reviewed the claim. In February 2019, Dr. William Black, a psychologist, conducted a review, in part due to Ms. Moseley submitting the report of another neuropsychological examination which she underwent in July 2018 (II, pp. 352-364). That neuropsychological examination made no mention of Ms. Moseley's mental health issues. Dr. Black found as follows:

> The 2018 NP evaluation does not clarify the insured's current actual BH condition. However, other file evidence, including the insured's self-report of anxiety and feeling overwhelmed, the 2015 NP evaluation and progress notes from psychotherapist, Vicki Anderson, PsyD support the conclusion that a BH condition is a contributor to the insured's cognitive issues and likely the primary ideology. Anxiety, Depression, and Fatigue (which may also be a symptom of a BH condition) more probably than not negatively affect cognitive efficiency and result in the nonspecific variable cognitive performance noted in the 2015 and 2018 NP evaluations (VI, pp. 2050-2051).

A second review was conducted by Alex Ursprung, Ph.D., also a psychologist. Dr. Ursprung agreed with Dr. Black that Ms. Moseley was disabled from her behavioral health conditions, at least through the neuropsychological examination in July 2018. However, both Dr. Black and Dr. Ursprung noted Ms. Moseley did not appear to be engaged in regular and appropriate care, and that appropriate care would be a psychiatric consultation and weekly or every other week individual psychotherapy. (IV, pp. 1640-1641).

Shortly thereafter, in April 2019, Ms. Moseley began seeing Dr. Anderson again. From April to October 2019, visits were monthly. Dr. Anderson continued to diagnose Ms. Moseley with significant depression and anxiety, and Ms. Moseley continued to take Wellbutrin and Lorazepam. (V, pp.1750-1752, 1860-1861, 1942-1947, 2601-2606).

In addition, Dr. Anderson provided information directly to Unum Life. In an Attending Physician Statement dated April 9, 2019, Dr. Anderson gave a primary diagnosis of a depressive disorder due to another medical condition (chronic Lyme disease) and also stated Ms. Moseley had an unspecified anxiety disorder. (V, pp. 1772-1774).

Dr. Anderson also completed a Mental Impairment Questionnaire dated August 19, 2019. In that, she again gave a diagnosis which included depression and anxiety. She noted Ms. Moseley was still taking Wellbutrin. In the questionnaire, Dr. Anderson was asked to provide Ms. Moseley's symptoms. Dr. Anderson gave a lengthy list, including involuntary, time-consuming preoccupation with intrusive, unwanted thoughts; depressed mood; sleep disturbance; observable psychomotor agitation; difficulty concentrating or thinking; distractibility; feelings of inadequacy; disproportionate fear or anxiety about different situations; disturbance in mood and behavior; and others. She stated Ms. Moseley had a documented history of depression and anxiety for at least two years and Ms. Moseley's psychological disorder exacerbated her experience of pain and other physical symptoms (VI, pp. 2012-2017).

Ms. Moseley also began seeing a neuropsychologist, Melinda Warner, in April 2019. Ms. Moseley saw Ms. Warner until August 2019. (V, p. 1923; VI, p. 2001). It is unclear what treatment Dr. Warner was providing to Ms. Moseley, but her records included the following:

- Ms. Moseley, while continuing to take Wellbutrin and Lorazepam, managed the level of those medications on her own. Dr. Warner also noted that the neuropsychological testing performed in July 2018 supported mental illness during that testing including anxiety, depression, decline in cognitive capability and slowed processing speed. (V, pp. 1923-1924).

- On June 5, 2019 Dr. Warner spoke with Dr. Anderson regarding Ms. Moseley's treatment. Dr. Anderson noted that Ms. Moseley was "extremely guarded and resistant in therapy with limited insight." Dr. Warner also noted that Ms. Moseley did not like to take her medication and that it may be an ongoing issue (V, p. 1927).

In September 2019, Dr. Warner also completed a Mental Impairment Questionnaire. Dr. Warner also noted that Ms. Moseley had a medically documented history of a psychological disorder for at least two years, specifically, anxiety, depression and a mild cognitive impairment. She also agreed that Ms. Moseley's psychological disorders and symptoms exacerbated her experience of pain and other physical symptoms. She also noted many of the symptoms which Dr. Anderson had found including depressed mood, decreased energy, difficulty concentrating, feelings of inadequacy, disturbance in mood and behavior, etc. (VII, pages 2520-2532).

Ms. Moseley stopped seeing Dr. Warner in August 2019 and began seeing another psychologist, Bruce Levine, Ph.D., in October 2019. (VII, p. 2607-2611). Ms. Moseley continued seeing Dr. Levine through at least November 2020. (IX, p. 3768). Like Ms. Moseley's other mental health providers Dr. Levine agreed that Ms. Moseley was suffering from anxiety and depression due to a medical condition as well as a mild neurocognitive disorder. (VIII, pages 3248-3251). Also, like Ms. Moseley's other mental healthcare providers, Dr. Levine accepted the diagnosis of Lyme disease for Ms. Moseley based upon the opinion of Dr. Joseph Jemsek. Consequently, it was his opinion that the symptoms of Lyme disease were leading to Ms. Moseley's depression and anxiety. (VIII, pages 3403-3407).

After receiving Dr. Levine's input, Unum Life had its medical consultant, Dr. Ursprung, conduct another review. Dr. Ursprung concluded Ms. Moseley's restrictions and limitations remained supported due to her behavioral health (mental illness) issues. It was Dr. Ursprung's opinion that the basis for Ms. Moseley's cognitive difficulties was psychological, and in this respect he disagreed with Dr. Levine. However, Dr. Ursprung deferred the determination of the etiology of the cognitive difficulties to Unum Life's medical doctors. (VIII, pp. 3415-3516). As

set forth in more detail in the following section, Unum Life medical consultants determined that Lyme disease was not the cause of Ms. Moseley's disability.

### E.  Ms. Moseley's Medical Conditions

As mentioned previously, shortly after moving from New Hampshire to the Washington, D.C. area to begin her job at the National Apartment Association, Ms. Moseley reported feeling unwell.  In March 2015, she had a consult with Dr. Mark Delman, an infectious disease specialist, with her chief complaint being concerned about Lyme disease.  In his office note, Dr. Delman noted that Ms. Moseley had a negative Lyme serology as part of her evaluation.  His assessment included the following:

> PT symptoms are not suggestive of Lyme disease.  If this was long-standing neuroborreliosis, I would expect a positive serology, which is not the case here.  No classic Sx of earlier stages of Lyme noted.  No other clear infectious etiology of Sx.  In absence of fevers, would not pursue more of an infectious workup.  If an LP is performed for other causes, would include Lyme PCR and Lyme serology in the CSF.  However, would not recommend an LP just for this reason as my suspicion is very low.  (III, pp. 933-934).

Ms. Moseley underwent imaging and lab tests, all of which were essentially normal, including an MRI of the brain, cervical spine and thoracic spine; MRAs of the head and neck, a lumbar puncture CT; a vestibular evaluation; and as previously described a neuropsychological evaluation. (III, pp. 901-937).

Despite Dr. Delman's opinion, Ms. Moseley continued to pursue the Lyme disease diagnosis with a visit to the Jemsek Specialty Clinic.  In July 2015, Ms. Moseley met with a physician assistant who stated as follows:

> I do suspect the infections involved with LBC (Lyme disease) are contributing and she would benefit from coordinated therapy.  I advised Sue that current available testing methods are flawed, and therefore, diagnosis of LBC is largely clinically based.  (III, p. 694).

Ms. Moseley had a course of antibiotic treatment at the Jemsek Specialty Clinic from October 2015 to September 2017. (III, pp. 667-688). At her visit in September 2017, Ms. Moseley reported that she did not think things were any better than they were at the beginning. (III, pp. 667-668). Therafter, Ms. Moseley had approximately annual visits to the clinic.

In a review of Ms. Moseley's claim in January 2019, Unum Life had Ms. Moseley's medical records reviewed by Dr. Joseph Antaki, a physician board certified in internal medicine. Dr. Antaki found that Ms. Moseley did not have restrictions and limitations due to a physical condition. Specifically, with respect to Lyme disease, Dr. Antaki noted the following:

- Ms. Moseley's March 2018 office visit to her primary care physician, Dr. Schneider described a physical exam without abnormalities and recommended that Ms. Moseley follow up annually.
- Ms. Moseley's office visit to Dr. Jemsek on March 13, 2018 described Ms. Moseley's physical exam as "surprisingly benign." Ms. Moseley's serum test results referenced in the file from June 15, 2015 were not consistent with the diagnosis of Lyme disease. Ms. Moseley had also reported that she had never had positive titters.
- Ms. Moseley's lumbar puncture results did not support Lyme disease.
- Dr. Delmar, the infectious disease physician, did not think Ms. Moseley's symptoms were infection related. (VI, p.2048).

Unum Life then had Ms. Moseley's records reviewed by a second physician, Jacqueline Crawford, M.D., board certified in neurology, and neuromuscular and electrodiagnositic medicine. Dr. Crawford also concluded that Ms. Moseley's cognitive issues were not due to Lyme disease. The basis of her opinion included the following:

- The file did not contain evidence of a verified tick attachment.
- Ms. Moseley denied ever experiencing a rash consistent with Lyme disease.
- Ms. Moseley's symptoms arose in December 2014 in Chicago, which would be highly atypical for Lyme disease since tick exposure is not anticipated in cool weather months.
- Ms. Moseley did not suffer from a facial palsy on her examinations, as might be expected by a patient with neuroborreliosis.

- Lab testing to detect Lyme disease was not supportive as there was no evidence of a positive Lyme antibody screen; no evidence of a positive Western Blot for Lyme disease; no evidence of a positive Lyme PCR (a test to detect the DNA of Lyme); Ms. Moseley's CSF evaluations was inconsistent with Lyme disease or any other infectious agent; white blood cells were not elevated; and the IG synthesis rate was not elevated.
- Dr. Delman concluded in March 2015 that Ms. Moseley's symptoms were not supportive of Lyme disease.
- Ms. Moseley's test results from the neuropsychological testing performed in July 2018 demonstrated atypical variability. Dr. Crawford found the extreme variability ranging from very superior to deficient was inconsistent with physically based cognitive deficits attributable to an infection, but was consistent with behavioral health conditions. (VI, pp. 2056-2057).

Also, in February 2019, a medical consultant for the Social Security Administration conducted an evaluation and determined that while Ms. Moseley had a moderate mental limitation, no physical impairment was established. (VI, pp. 2327-2329).

Because Ms. Moseley continued to pursue her claim on the basis of Lyme disease, another medical review was conducted by Dr. Antaki in October 2019. Dr. Antaki continued to find that the medical evidence did not support restrictions and limitations from a non-behavioral health condition. (VI, pp. 2072-2073). Dr. Antaki then wrote to Dr. Jemsek and stated that it was his opinion that the records supported restrictions and limitations related to the diagnosis of depression and anxiety and asked whether there was any other information Dr. Jemsek could provide. Dr. Jemsek's response was simply "I agree." (VI, pp. 2076-2077, 2081).

Notwithstanding Dr. Jemsek's response to Dr. Antaki's letter, because Dr. Jemsek had submitted a statement in July 2019 that Ms. Moseley's limitations were due to Lyme disease, Unum Life had Dr. Crawford conduct another review. Dr. Crawford found that Dr. Jemsek's opinion that Ms. Moseley was impaired by Lyme disease was not supported by the data. Dr. Crawford also noted that there continued to be no serologic testing to substantiate a Lyme disease diagnosis; Ms. Moseley's symptoms were non-specific; her neurological examination

was essentially normal; Ms. Moseley reported activity consistent with intact neurologic function; and there were no new brain imaging, Lyme serologies, or CSF studies which supported a Lyme disease diagnosis. Thus, Dr. Crawford continued to opine that there were no non-behavioral health conditions that were limiting Ms. Moseley. (VI, pp. 2085-2087).

In October 2019, Ms. Moseley was awarded Social Security disability benefits. In the Administrative Law Judge's decision, he found Lyme disease was the basis of the disability and specifically rejected the opinions of the two reviewing physicians the Social Security Administration engaged to review Ms. Moseley's claim. Those physicians had opined that Ms. Moseley did not have medically determinable physical impairments. (VII, p. 2591). The ALJ found Dr. Jemsek's opinion to be persuasive. (VII, p. 2590).

Subsequent to receiving the Social Security decision in late 2019, Unum Life asked both Dr. Antaki and Dr. Crawford to conduct another review. Dr. Antaki noted that the information upon which the Social Security decision was based was the same information he had previously reviewed and therefore the decision did not change his opinion. (VIII, pp. 3163-3164). Dr. Crawford came to the same conclusion. (VIII, pp. 3170-3172). Both Dr. Antaki and Dr. Crawford conducted a final review in August 2020 after receiving additional records from Ms. Moseley. Both physicians continued to find Lyme disease not to be disabling and both noted Ms. Moseley's more active lifestyle including cross-country skiing, yoga, overseeing condo renovations, involvement in the condo association, taking a wilderness first aid course, and hosting dinners. (IX, pp. 3695-3697; 3703-3704).

Finally, in 2022, in connection with Ms. Moseley's administrative appeal, Unum Life conducted its last medical review of Ms. Moseley's claim. Ms. Moseley's claim was reviewed by two physicians. The first, Dr. Scott Norris, is board certified in family, occupational, and

aerospace medicine.  The second physician is Dr. Elizabeth Belanger, who is board certified in internal medicine and infectious diseases.  Both Dr. Norris and Dr. Belanger conducted an extensive review of Ms. Moseley's medical history and issued detailed reports. (IX, pp. 3976-3989).  Both Dr. Norris and Dr. Belanger found Ms. Moseley was not unable to engage in her occupational duties due to non-behavioral health conditions.  In particular, with regard to Lyme disease or any other infectious disorder, Dr. Belanger, the infectious disease specialist, did a detailed review and made numerous findings including the following:

- Dr. Belanger noted that the Center for Disease Control criteria for a clinical diagnosis of Lyme disease which had been updated in 2022 required one of the following disease manifestations to be reported by a healthcare provider: erythema migraine rash, objective joint swelling, lymphocytic meningitis, cranial neuritis (particularly unilateral or bilateral facial palsy), radiculoneuropathy, encephalomyelitis, or acute onset high-grade atrioventricular conduction defects that resolve within days to weeks.

- The July 2015 vestibular neurology evaluation documented Ms. Moseley as denying any prior history of erythema migraine rash.

- While arthralgia and myalgia were described, no joint swelling was reported by Ms. Moseley or documented by her physicians.

- Ms. Moseley's September 30, 2020 primary care visit to Dr. Curtis specified the absence of joint pain, joint swelling, joint tenderness or joint stiffness, and the exam described Ms. Moseley's musculoskeletal system as within normal limits.

- Ms. Moseley's September 10, 2021 visit to the Jemsek Specialty Clinic noted the absence of arthropathy with no pain on light compression of the joints.

- Although exams from the Jemsek Specialty Clinic at times noted head-neck neuro-irritability, petosis and nasolabial flattening, no other healthcare providers, including neurology or otolaryngology noted these findings or any other findings suggestive of a facial palsy, meningitis or cranial neuritis.

- While Ms. Moseley reported paresthesia to multiple providers, no symptoms, descriptions or exam findings were suggestive of a radicular pattern.

- There were no abnormal mental status examinations suggestive of encephalomyelitis and no MRI findings to suggest encephalitis or cervical or thoracic myelitis.

- Cardiac evaluations in 2017 and 2018 did not demonstrate evidence of conduction defects or brady-arrhythmias.

- Dr. Belanger also noted the 2022 CDC criteria for the laboratory diagnosis of Lyme disease required some findings in testing, none of which Ms. Moseley had. (IX, pp. 3984-3989).

Consequently, Unum Life upheld its determination that Ms. Moseley's disability was based on her behavioral health conditions, not Lyme disease. (X, pp. 4033-4044).

### III.    ARGUMENT

#### A.    The Standard of Review

The standard of review in an ERISA case differs from the review in an ordinary civil case, where summary judgment serves as a procedural device designed to screen out cases that present no trial worthy issues. Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st Cir. 2002). In a denial of benefits case, "the district court sits more as an appellate tribunal than as a trial court." Id. at 18. In an ERISA case, where review is based only on the Administrative Record before the plan administrator, "summary judgment is simply a vehicle for deciding the issue. This means the non-moving party is not entitled to the usual inferences in its favor." Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005) (internal citations omitted); accord Liston v. Unum Corp. Officer Sev. Plan, 330 F.3d 19, 24 (1st Cir. 2003) ("[N]o special inferences are to be drawn in favor of a plaintiff resisting in summary judgment; on the contrary, the rationality standard tends to resolve doubts in favor of the administrator.").

#### B.    The Plan Grants Unum Life Discretionary Authority.

The Supreme Court has held "a denial of benefits under §1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Orndorf, 404 F.3d at 516, n.7, quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115

(1989). When the plan affords an insurer discretion to determine eligibility for benefits, a court reviews the benefit decision under a deferential arbitrary and capricious standard. See Ovist v. Unum Life Insurance Company of America, 14 F.4th 106, 117 (1st Cir. 2021). See also Ortega-Candelaria v. Johnson & Johnson, 755 F.3d 13, 20 (1st Cir. 2014).

The Plan provides Unum Life with the discretionary authority to determine benefit eligibility. The Policy explicitly states:

> When making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy. (I, p. 3).

The Policy further provides:

> The Plan, acting through the Plan Administrator, delegates to Unum and its affiliate Unum Group discretionary authority to make benefit determinations under the Plan. Unum and Unum Group may act directly or through their employees and agents or further delegate their authority through contracts, letters or other documentation or procedures to other affiliates, persons or entities. Benefit determinations include determining eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing the provisions of the Plan. All benefit determinations must be reasonable and based on the terms of the Plan and the facts and circumstances of each claim. (I, p. 50).

This language is sufficient to confer discretion to determine eligibility for benefits and to construe the terms of the Plan. See Medina v. Metropolitan Life Ins. Co., 588 F.3d 41, 45 n.2 (1st Cir. 2009) (arbitrary and capricious standard applied where plan provided that MetLife "shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan . . ."); Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004); Schwartz v. Keolis Commuter Services, 2018 WL 1411202, *5 (D. Mass. 2018).

### C. Unum Life's Decision Must Be Upheld Unless It Is Arbitrary or Capricious.

To prevail, Ms. Moseley has the burden of establishing a violation of ERISA as a matter of law. Namely, that Unum Life acted arbitrarily and capriciously. Terry v. Bayer Corp., 145

F.3d 28, 34 (1st Cir. 1998). Under that standard, the question before the Court is whether Unum Life's action on the record before it was unreasonable. Liston, 330 F.3d at 24.

Under the arbitrary and capricious standard, the decision of the plan administrator is upheld even where contrary evidence might suggest a different result, so long as the decision "is plausible in light of the record as a whole, … or, put another way, whether the decision is supported by substantial evidence in the record." Leahy, 315 F.3d at 17. "Substantial evidence … means evidence reasonably sufficient to support a conclusion. Sufficiency, of course, does not disappear merely by a reason of contradictory evidence." Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998). See also Ovist, 14 F.4th at 117. The question is "not which side [the court] believe[s] is right, but whether [the administrator] has substantial evidentiary grounds for a reasonable decision in its favor." Id. That is, the administrator's decision "must be upheld if there is any reasonable basis for it." Morales-Alejandro v. Medical Card System, Inc., 486 F.3d 693, 698 (1st Cir. 2007), quoting Madera v. Marsh USA, Inc., 426 F.3d 56, 64 (1st Cir. 2005).

This Court need not decide the "best reading" of the Plan. O'Shea v. UPS Retirement Plan, 837 F.3d 67, 73 (1st Cir. 2016) quoting Lennon v. Metro. Life Ins. Co., 504 F.3d 617, 624 (6th Cir. 2007). This Court need only consider whether Unum Life's interpretation of the Plan and its application of the Plan terms to the facts of this case was "reasoned and supported by substantial evidence." Ibid. (other citations omitted). Therefore, "a court is not to substitute its judgment for that of the [decision-maker]." Terry, 145 F.3d at 40 (alteration original). Any questions of judgment are left to Unum Life. The issue before this Court "is simply whether the judge deems the administrator's denial of benefits irrational." Liston, 330 F.3d. at 24. Accordingly, Unum Life's decision regarding Ms. Moseley's claim can be reversed only if the

"determination was unreasonable in light of the information available to" Unum Life. Cook v. Liberty Life Assurance Co., 320 F. 3d 11, 19 (1st Cir. 2003).

As stated by the First Circuit:

> Disability, like beauty, is sometimes in the eye of the beholder. This is such a case: we have scrutinized the record with care and conclude, without serious question, that it is capable of competing inferences as to the extent of the plaintiff's ability to work. This clash does not suffice to satisfy the plaintiff's burden. We have held before, and today reaffirm, that the mere existence of contradictory evidence does not render a plan fiduciary's determination arbitrary and capricious. Indeed, when the medical evidence is sharply conflicted, the deference due to the plan administrator's determination may be especially great. Leahy, 315 F.3d at 19.

### D. Unum Life's Decision Was Not Arbitrary or Capricious.

Unum Life's determination that the cause of Ms. Moseley's disability was her depression and anxiety, not Lyme disease, is supported by substantial evidence and must be upheld by this Court. With regard to Ms. Moseley's contention that she is disabled by Lyme disease, her sole support is the opinion of Dr. Jemsek. In contrast, Unum Life has had Ms. Moseley's medical history and condition reviewed by four physicians, Dr. Antaki, Dr. Belanger, Dr. Crawford, and Dr. Norris, all of whom have found no support for the diagnosis of Lyme disease or that Ms. Moseley is disabled due to it. Moreover, one of Ms. Moseley's own physicians, Dr. Delman, an infectious disease specialist, did not think Ms. Moseley had Lyme disease. (III, p. 933-934).

As reiterated by the First Circuit in Ovist, 14 F.4th at 120, "Under the arbitrary and capricious standard, [the court's] task is not to re-weigh the evidence in the record. Instead, we must uphold the plan administrator's decision if it 'is reasonable and supported by substantial evidence on the record as a whole.'" (citations omitted). In this case, the reviews conducted by Unum Life's medical consultants were consistent that there was no support for a diagnosis of Lyme disease. The basis for Unum Life's decision is carefully set forth in its final determination letter dated June 1, 2022, and attached hereto as Exhibit A. (X, pp. 4033-4044).

While Ms. Moseley may point to the Social Security decision in support of her claim, Unum Life considered that determination and disagreed given that the medical reviews found no support for a diagnosis of Lyme disease or any infectious etiology. (X, p. 4041).

Finally, while Ms. Moseley is expected to argue that Dr. Jemsek's opinion should be given greater weight than those of Unum Life's medical consultants, that is not the test. The First Circuit has held that "a non-examining physician's review of a claimant's file [to be] . . . reliable medical evidence." Gannon, 360 F.3d at 214. As the Supreme Court stated:

> If a consultant engaged by a plan may have an "incentive" to make a finding of "not disabled," so a treating physician, in a close case, may favor a finding of "disabled." Black & Decker Disability Plan v. Noord, 538 U.S. 822, 832 (2003).

The First Circuit has similarly held. See Brigham v. Sun Life of Canada, 317 F.3d 72, 84 (1st Cir. 2003) (the insurer's decision to look . . . beyond [the claimant's] doctors' conclusion was not arbitrary); Richards, 592 F.3d at 239-240 (the opinion of the claimant's treating physician is not entitled to special deference); Dutkewich v. Standard Ins. Co., 2014 WL 1334169 (D. Mass. 2014) (any bias which may exist between particular reviewers chosen by the insurer and the claimant's treating physicians "who are invested in that diagnosis" does not undercut the reasonableness of the insurer's decision); Orndorf v. Paul Revere Life Insurance Company, 404 F.3d 510, 526 (1st Cir. 2005).

This case is similar to Gant v. CUNA Mut. Ins. Soc., 2008 WL 4083004 (D. Mass. 2008). There, as in this case, Gant was approved for disability benefits due to depression which had a two year limitation period. Gant argued he was disabled due to Lyme disease. Applying de novo review, the court held there was no persuasive evidence that Gant suffered from a disability due to Lyme disease. As in this case, Gant's psychiatrist had given an opinion that Gant was suffering from Lyme disease. The court gave that less weight given the psychiatrist was not trained in internal medicine or infectious diseases. The court also noted the doctors who opined

that Gant did not suffer from Lyme disease generally weighed the broader range of objective evidence in forming their conclusions such as CFS test results, the lack of serological evidence, and a negative Western Blot test.  The court entered summary judgment in favor of CUNA.

Given the detailed reviews conducted by Unum Life's physicians, particularly that of the infectious disease specialist, Dr. Belanger, there is no basis to conclude Unum Life did not have substantial evidence upon which to base its decision that Ms. Mosely was disabled due to depression and anxiety and not Lyme disease. Unum Life's decision was not arbitrary and capricious.

## IV.     CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, the defendants request that this Court enter summary judgment in their favor.

> UNUM LIFE INSURANCE COMPANY
> OF AMERICA and UNUM GROUP,
>
> By their attorney,
>
> /s/ Joseph M. Hamilton
> Joseph M. Hamilton
> BBO #546394
> Mirick, O'Connell, DeMallie & Lougee, LLP
> 100 Front Street
> Worcester, MA 01608-1477
> Phone: (508) 791-8500
> Fax:    (508) 791-8502
> jhamilton@mirickoconnell.com

Dated: January 30, 2023

### CERTIFICATE OF SERVICE

I, Joseph M. Hamilton, hereby certify that this document(s), filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 30, 2022.

> /s/ Joseph M. Hamilton
> Joseph M. Hamilton